## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| DAVID H. GOODMAN, on behalf of himself and derivatively on behalf of KEY INGREDIENT CORPORATION, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:12-cv-01169 |
| PHILIPPE CREVOISIER, CHRISTOPHE BOUZIGUES, KEVIN CAMPHUIS, SEB S.A.S. d/b/a SAS SEB, SEB S.A. d/b/a GROUPE SEB,  and SEB ALLIANCE d/b/a GROUPE SEB ALLIANCE, | § § § § § | |
| Defendants. | | |

### ORIGINAL COMPLAINT AND APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff David H. Goodman, on behalf of himself and derivatively on behalf of Key Ingredient Corporation ("Key Ingredient"), hereby files this Original Complaint and Application for Preliminary and Permanent Injunctive Relief against Defendants Philippe Crevoisier, Kevin Camphuis, Christophe Bouzigues, SEB S.A.S. d/b/a SAS SEB ("SAS SEB"), SEB S.A. d/b/a Groupe SEB ("Groupe SEB"), and SEB Alliance d/b/a Groupe SEB Alliance ("Groupe SEB Alliance") and would respectfully show:

### OVERVIEW

1.      This lawsuit seeks redress for wrongs done by Defendants to both Goodman personally as well as to the company he founded and in which he owns a minority stake, Key Ingredient.

2.      In one aspect, this is a derivative shareholder suit concerning breaches of fiduciary duty by three of the four members of Key Ingredient's board of directors. Each of

those three directors have taken numerous actions to place the best interests of Key Ingredient's majority shareholder—Defendant Groupe SEB Alliance, and its corporate parent, Defendant Groupe SEB—above the interests of Key Ingredient, to the detriment of Key Ingredient and its sole minority shareholder, Goodman.

3.      In July 2012, Goodman contacted Defendants Philippe Crevoisier and Kevin Camphuis (along with Christophe Bouzigues, "Director Defendants") concerning breaches by various Groupe SEB subsidiaries (collectively, "SEB") of an exclusive services and non-competition agreement with Key Ingredient.  Goodman, who was also then CEO of Key Ingredient, urged his fellow directors (each of whom is an officer of one or more Groupe SEB-affiliated entities) to take steps to bring SEB into compliance with their contractual obligations. Director Defendants failed to take any action.  After several months of working for resolution, including sending demand letters seeking SEB's voluntary compliance, Key Ingredient's attorneys filed an arbitration demand on Key Ingredient's behalf to enforce its contractual rights. In response, Goodman's fellow directors voted to terminate Goodman as CEO of Key Ingredient and directed Key Ingredient's counsel to stand down on the arbitration.  Director Defendants' actions have allowed SEB to continue breaching its contractual obligations to Key Ingredient unfettered.

4.      Goodman learned in October 2012 that, for more than 18 months, Groupe SEB and its subsidiaries—acting through or in concert with Director Defendants—have been secretly using Key Ingredient's proprietary materials to obtain an approximately €20 million grant authorized by the French Prime Minister from the French government agency, OSEO, for a project called Open Food System ("OFS") that will benefit Groupe SEB and several of its

industry partners, to the exclusion of Key Ingredient.  SEB's actions violate covenants it made against competing with Key Ingredient and disclosing Key Ingredient's materials.

5.      Based on Director Defendants' statements and actions, there is a substantial likelihood that they are causing Key Ingredient's source code and data structures to be disclosed and made public in connection with the OFS research project now underway.  Such a disclosure, if not restrained, will result in substantial, irreparable harm to Key Ingredient.

6.      Goodman—on behalf of himself and Key Ingredient—seeks damages, restitution, and injunctive relief to redress Director Defendants' actions that have placed the best interests of Groupe SEB and its affiliates above Key Ingredient, which they were duly appointed to serve as directors.

7.      The second aspect of this lawsuit is brought in Goodman's personal capacity, and it concerns Goodman's claim for a fraudulently induced stock sale.  Groupe SEB's misuse of Key Ingredient's proprietary materials in association with the OFS grant submission began while the parties were still negotiating Groupe SEB Alliance's acquisition of Key Ingredient stock from Goodman, at a time that Key Ingredient made those materials available to Groupe SEB for due diligence purposes.  Groupe SEB and Groupe SEB Alliances' failure to disclose their misuse of Key Ingredient's materials was a material omission, and as a result, the terms of the stock purchase agreement were tainted by fraud.  Goodman seeks damages, restitution, and rescission of the stock purchase agreement.

## **PARTIES**

8.      Key Ingredient is a privately held Delaware corporation with its principal place of business in Austin, Texas, USA.  Key Ingredient's headquarters are at 720 Brazos Street, Suite 810, Austin, Texas 78701. Key Ingredient is a vendor and licensor of kitchen-centric Content

1810092v1 12/21/2012

Management Systems and custom kitchen-safe tablet hardware.  Key Ingredient may be served with process by serving David H. Goodman, its registered agent.

9.      Plaintiff Goodman is the founder of Key Ingredient and was Chief Executive Officer until November 12, 2012 when he was terminated by the Groupe SEB-controlled Board. Until 2011, Goodman was the majority stockholder of Key Ingredient.  Goodman currently holds approximately 28.81% of the issued stock in Key Ingredient (27.8%, fully diluted).  Goodman continues to serve as a director of Key Ingredient.

10.      On information and belief, Defendant SEB S.A., d/b/a Groupe SEB  ("Groupe SEB") is a multi-billion euro, multi-national conglomerate based in France.  Groupe SEB has a presence in 150 countries and is a leader in small household equipment, including cookware, pressure cookers, steam irons, electric kettles, toasters, and deep fryers.  Groupe SEB owns brands such as Krups, All-Clad, T-Fal, and others.  On information and belief, Groupe SEB Alliance is a company formed under French law, and its address is Chemin du Petit-Bois – Les 4M, B.P. 172, 69134 Ecully Cedex, France.

11.      On information and belief, Defendant SEB Alliance d/b/a Groupe SEB Alliance ("Groupe SEB Alliance") is the investment arm of Groupe SEB and was Goodman's contractual counterparty in the Stock Purchase Agreement of May 16, 2011.  Groupe SEB Alliance currently holds approximately 71.19% of the issued stock of Key Ingredient (68.69%, fully diluted).  On information and belief, Groupe SEB Alliance is a company formed under French law, and its address is Chemin du Petit-Bois – Les 4M, B.P. 172, 69134 Ecully Cedex, France.

12.      Defendant SEB S.A.S. d/b/a SAS SEB ("SAS SEB") is a subsidiary of Groupe SEB and is Key Ingredient's contractual counterparty in the CMS Access and Services

Agreement dated as of May 21, 2012.  On information and belief, SAS SEB is a company formed under French law, and its address is Rue de la Patenée, 21261 Selongey Cedex, France.

13.     Defendant Crevoisier is a member of the Key Ingredient board of directors (the "Board") and was appointed by Groupe SEB Alliance shortly after it purchased a controlling interest in Key Ingredient in May 2011.  Crevoisier is also the president of SAS SEB.  On November 12, 2012 the Board designated Mr. Crevoisier as acting CEO of Key Ingredient. Crevoisier may be served at his office address of Rue de la Patenée, 21261 Selongey Cedex, France, or wherever he may be found.

14.     Camphuis is a member of the Board and was appointed by Groupe SEB Alliance shortly after it purchased a controlling interest in Key Ingredient in May 2011.  Camphuis is also the head of SEB's Atelier Digitale and Digital Workshop Director for Groupe SEB.  Camphuis may be served at his office address of Rue de la Patenée, 21261 Selongey Cedex, France, or wherever he may be found.

15.     Bouzigues is a member of the Board and was appointed by Groupe SEB Alliance shortly after it purchased a controlling interest in Key Ingredient in May 2011.  On information and belief, Mr. Bouzigues is also the chief financial officer of SEB USA and Senior Vice-president, Finance North America at Groupe SEB USA, Inc.  Bouzigues may be served at his office address of Chemin du Petit-Bois – Les 4M, B.P. 172, 69134 Ecully Cedex, France, or wherever he may be found.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the claims asserted in this suit pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332.  Plaintiff is a citizen of Texas, Defendants are citizens of France, and the amount in controversy exceeds $75,000.

1810092v1 12/21/2012

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

18.     Each of the Director Defendants is subject to personal jurisdiction in Texas because they have served on the board of directors for—and, as described below, committed torts against—Key Ingredient, a corporation headquartered in Texas.  Each of Groupe SEB, Groupe SEB Alliance, and SAS SEB are subject to personal jurisdiction in Texas because, as described below, each has either contracted with—or conspired to commit torts against—Key Ingredient, a corporation headquartered in Texas.

## DERIVATIVE ALLEGATIONS

19.     With respect to the derivative claims asserted in this suit, demand is excused.  The Key Ingredient Board, as currently constituted, is incapable of making an impartial decision regarding whether to institute litigation against Defendants because there is reasonable doubt that the directors are disinterested and independent and/or that the transactions described herein otherwise represent the product of valid exercise of business judgment.

20.     The ability of the Board to consider the merits of the self-dealing allegations herein is tainted by the direct, financial, and occupational interests held by a majority of the Board members in Groupe SEB, its subsidiaries, and/or its affiliates. Certain of the claims herein are directed toward a majority of the members of the Board including allegations of corporate waste, misappropriation of trade secrets, and fraud.

21.     Moreover, the allegations herein establish a reasonable probability that a majority of the Board assisted and/or directly acted in furtherance of majority-stockholder Groupe SEB Alliance's usurpation of corporate opportunities and fraud against Key Ingredient.

22.     Both as a shareholder and as a director, Plaintiff will fairly and adequately represent the interests of the company, and has retained competent counsel to enforce and prosecute this action.

## STATEMENT OF FACTS

**A.      Key Ingredient**

23.     Key Ingredient was founded in 2005 by David Goodman. From the date of its founding until a 2011 stock acquisition by Groupe SEB Alliance, Goodman was Key Ingredient's CEO, sole shareholder, and sole director.

24.     In 2008, after three years of development and significant personal financial investment, Key Ingredient launched the Key Ingredient recipe ecosystem, complete with a website, custom-designed Recipe Reader tablet, and, as of 2010, an Apple iOS application.  Key Ingredient's ecosystem contains the largest recipe database in the United States, hosting more than 1.7 million recipes shared by cooks from all over the world and streaming over 25 million recipes a month.

25.     The database that forms the foundation of the Key Ingredient recipe ecosystem is the Key Ingredient Content Management System ("CMS").  The CMS is a computer platform that serves as the backbone for recipe exchange social media services offered through websites, mobile applications, tablet applications, blog widgets, and the like. The Key Ingredient CMS is made up of proprietary database architecture, schema, data, software, a database management system, and associated hardware and network connections.

26.     The Key Ingredient CMS is highly customized and state of the art in the digital recipe marketplace. Each recipe in Key Ingredient's CMS includes multiple pieces of information, including who created the recipe, when it was created, who has reviewed the recipe,

7

who has marked the recipe as a favorite, what and how many ingredients or categories of ingredients are included in the recipe, photographs and reviews of the recipe, and much more. Key Ingredient's CMS uses its 7 million lines of proprietary code to capture, organize, link together, and make usable each of these pieces of information to provide a seamless experience for consumers.

27.    The Key Ingredient CMS communicates with external services through an Application Programming Interface ("API").    As a protection against unauthorized users accessing or tampering with its CMS, Key Ingredient employs a technology known as an API Key.  The API Key is further used as a measure to compute usage by each key the fees due to Key Ingredient per key.

28.    After it first launched in 2008, Key Ingredient enjoyed rapid success.  At the first trade show where its recipe reader device was demonstrated, product buyers from Nieman Marcus and Amazon purchased all of Key Ingredient's initial inventory.  Early marketing efforts resulted in Key Ingredient's recipe reader and internet database being featured and recommended through numerous media outlets, such as the Martha Stewart show, the View, Rachael Ray Magazine, and the Ellen DeGeneres show.

**B.    Groupe SEB Approached Key Ingredient About Joint Opportunities**

29.    At a consumer electronics trade show in January 2010, Goodman and Key Ingredient's Chief Technology Officer, Jesse  Lovelace, were approached by representatives for Groupe SEB, who expressed an interest in Key Ingredient's proprietary technology and the possibility of exploring potential business opportunities together.

30.    Soon thereafter, the parties executed a nondisclosure agreement, and Key Ingredient shared much of its business operations with Groupe SEB.  The materials provided to

1810092v1 12/21/2012

Groupe SEB included valuable and confidential information, such as Key Ingredient's business plans, revenue models, hardware designs, bills of materials, marketing materials, renderings, technical specifications, machine-to-machine architecture, embedded-hosted system architecture, and CMS architecture (including its source code and database design).

### C.     The Parties Negotiate and Execute the Stock Purchase Agreement

31.     Over the next 16 months, Goodman and Groupe SEB engaged in numerous communications and back-and-forth negotiations.  Early discussions centered on the possibility that Key Ingredient would produce a private-label recipe reader for Groupe SEB.  Later discussions turned to a potential buyout of Key Ingredient by Groupe SEB.

32.     On or around May 25, 2011, Group SEB Alliance, Goodman, and Key Ingredient entered into a Stock Purchase Agreement ("SPA"). Under the SPA, Groupe SEB Alliance purchased approximately 71.19% of the stock of Key Ingredient for $3,003,000, leaving Goodman with approximately 28.81% of the Key Ingredient stock.

33.     Following the execution of the SPA, the Board consisted of Goodman, as chairman of the Board, and the three Groupe SEB representatives—Crevoisier, Camphuis, and Bouzigues.

### D.     A New Direction for Key Ingredient

34.     Almost immediately after the SPA was signed, Key Ingredient's Board of Directors established a new direction for the company.  Whereas Key Ingredient's primary source of revenue prior to the acquisition was in the sale of its recipe reader devices to end users, Director Defendants were more interested in putting Key Ingredient's technology team to work for SEB.

1810092v1 12/21/2012

35.     The parties executed various development and work-for-hire agreements, and Key Ingredient set out to develop for Groupe SEB a French-language corollary to its own website and recipe reader, which would be branded as LeFoodle and MonFoodle, respectively.  The parties discussed and agreed that Key Ingredient would maintain ownership of—and development responsibility for—the CMS, which the LeFoodle website and MonFoodle reader rely on to host their content.

36.     Though willing to accommodate Director Defendants' new direction for his company, Goodman also sought to keep Key Ingredient's original core business going.  To that end, Goodman sought additional capital from Groupe SEB Alliance so that Key Ingredient could build additional inventory of its recipe readers, which were chronically sold out.

37.     Despite the fact Groupe SEB Alliance had committed itself in the SPA to loan Key Ingredient up to $1,000,000 upon request from Key Ingredient's Board of Directors, Director Defendants refused to approve any additional investment of capital for the manufacturing of inventory.

38.     Over the course of the next year, the development work on the LeFoodle and MonFoodle project consumed the majority of Key Ingredient's available staffing resources and capital.  As a result, Key Ingredient became increasingly dependent upon Groupe SEB and its affiliates for revenue.

**E.     The Parties Negotiate and Execute the CMS Agreement**

39.     While development work on the LeFoodle, MonFoodle, and the CMS were ongoing, Goodman pointed out to Director Defendants that the parties had not yet agreed upon terms under which Groupe SEB would compensate Key Ingredient for access to, and reliance on, Key Ingredient's proprietary CMS.  Director Defendants' initial response was to suggest that

10

Groupe SEB could use the CMS and related confidential information without compensating Key Ingredient, apparently failing to appreciate that Key Ingredient was not Groupe SEB's wholly-owned subsidiary and that the CMS was not a Groupe SEB asset.  Goodman, acting for Key Ingredient, countered that Groupe SEB would be required to purchase a license in order to access and use Key Ingredient's CMS and related technology.

40.    Negotiations over a licensing agreement were protracted.  Initially, Groupe SEB insisted that both Key Ingredient and SAS SEB—the entity designated to execute the licensing agreement on behalf of the Groupe SEB companies—should be represented by the same counsel, nothwithstanding the adversity of their interests in the negotiation.  Groupe SEB also attempted to force upon Key Ingredient a dramatically low royalty rate that bore no relationship to fair market value but was instead alleged to be the standard rate paid by all subsidiaries in the Groupe SEB family of companies.

41.    As CEO for Key Ingredient, Goodman retained counsel and experts on transfer pricing issues to assist Key Ingredient in the negotiations.

42.    Also, during the parties' discussions, Groupe SEB disclosed that it was working on  various projects that appeared to be in competition with Key Ingredient's CMS.  Goodman insisted that neither Groupe SEB nor its affiliates develop or market a competing CMS.

43.    On May 21, 2012, after several months of negotiations, Key Ingredient and SAS SEB executed the CMS Access and Services Agreement ("CMS Agreement"), which granted SAS SEB and its affiliates a limited license to use the Key Ingredient CMS.  In exchange, SAS SEB agreed to pay Key Ingredient monthly fees, based on the number of API Keys that were issued and registered by Key Ingredient, as well as fees tied to the number of individual users accessing the CMS and the total amount of data used.

44.     The CMS Agreement also provided that SAS SEB and its affiliates would not "authorize or permit any third party to . . . during the Term, develop, market, offer for sale or sell any system, software or offering that is substantially similar to or that would compete with the CMS offered under this Agreement."  CMS Agreement § 2.4.

**F.      SEB Usurps Corporate Opportunities and Uses Key Ingredient's Proprietary CMS to Benefit SEB and Its Affiliates**

45.     In July 2012, Key Ingredient discovered that notwithstanding its contractual obligations, Groupe SEB was developing and marketing a competing CMS to power one of its websites, myactifry.com.[1] Like Key Ingredient's CMS, the CMS powering myactifry.com allows users to dynamically store, retrieve, search, and track recipe content via a hosted server. Given Groupe SEB's inability to develop a dynamic CMS before entering into the CMS Agreement with Key Ingredient, it appeared that Groupe SEB misused Key Ingredient's confidential information and intellectual property to develop this competing CMS.

46.     Key Ingredient also discovered that SAS SEB or its affiliates were engaged in ongoing efforts with a third party, Tévolys, to develop and market competing CMS services for at least four additional SEB projects: (1) MonActifry iOS, (2) MonActifry Android, (3) Mon Autocuiseur iOS, and (4) Mon Autocuiseur Android. The download pages for each of these applications confirm that a SAS SEB affiliated company designed these products and applications in conjunction with Tévolys.

47.     Tévolys is in the business of developing and marketing CMS services and is a competitor of Key Ingredient. The competing CMS that SAS SEB and Tévolys are developing to power each of these applications allows the user to dynamically save recipes into a customer

---

[1] Note that when users type myactifry.com into the web browser, they are automatically diverted to tfalactifry.com, which is a SEB website.  In correspondence, the parties have referred to this as the myactifry.com website.

1810092v1 12/21/2012

account and share those recipes with other application users. This is the same functionality as Key Ingredient's CMS provides. Upon information and belief, Groupe SEB has improperly used and disclosed to Tévolys Key Ingredient's confidential information and intellectual property in developing the competing CMS in order to benefit from the CMS to the exclusion of Key Ingredient.

48.     On July 11, 2012, immediately after Key Ingredient discovered the myactifry.com website, Key Ingredient contacted Defendant Camphuis (Groupe SEB's representative and Key Ingredient Board member) about Groupe SEB's violation of the non-compete provision in the CMS Agreement.

49.     In a telephone call on July 27, 2012, SAS SEB's president of Kitchen Electrics, Defendant Crevoisier (also a Key Ingredient Board member) and Mr. Camphuis agreed that Key Ingredient was Groupe SEB's exclusive CMS provider and promised to follow up in early September with additional details on transferring the myactifry.com project to Key Ingredient's CMS.

50.     Key Ingredient again raised with SAS SEB the issue of the four applications using a competing CMS in meetings between Goodman and Defendants Camphuis and Crevoisier on October 4 and 5, 2012.   During those meetings and in a written summary of the meetings, Defendant Camphuis and Crevoisier conceded that SAS SEB was improperly disseminating Key Ingredient's confidential information in such a way as to benefit SAS SEB to the exclusion of Key Ingredient.   A few days later, Camphuis promised in writing that all of these applications "will be linked in the KI CMS in the coming weeks."

13

51.     Despite these admissions and promises, SAS SEB has since refused to transfer the violating projects to Key Ingredient's CMS or provide a timeframe for doing so in order to rectify the usurpation of corporate opportunities to the exclusion of Key Ingredient.

52.     During October 2012, Key Ingredient continued to discover additional SEB projects wrongfully benefitting from Key Ingredient's proprietary information to the exclusion of Key Ingredient, namely the application named Julie & Moi.

G.     **Groupe SEB Wrongfully Uses Key Ingredient's Proprietary Information to Obtain Financing**

53.     At the October 5, 2012 meeting, Crevoisier also disclosed that Groupe SEB had obtained a €20 million grant authorized by French Prime Minister François Hollande and issued from the French government agency, OSEO, for a project called Open Food System ("OFS"). The OFS project appears to be identical to projects that Key Ingredient is developing or has planned to develop, and the proposal to OSEO appears to incorporate, without permission, Key Ingredient's confidential information.

54.     Written OFS materials that Crevoisier shared with Goodman show that at least some of Key Ingredient's proprietary information has already been shared with OSEO in connection with the grant and that the date of Groupe SEB's initial submission to OSEO was in April 2011—before the Stock Purchase Agreement was executed but well into the parties' due diligence period during which Groupe SEB had extensive access to Key Ingredient's confidential materials.

55.     As described to Goodman by Crevoisier, the plan for the Open Food System project involves shared access to an ecosystem that will depend on the development of a system similar to the Key Ingredient CMS, but which will be open-source, *i.e.*, a system that is not protected as confidential or proprietary.  Crevoisier also made repeated demands for access to

Key Ingredient's source code, so that he and the SEB entities with which he is affiliated could use it as part of the development of the OFS project.  Goodman refused to turn over the source code, explaining that it was Key Ingredient's most valuable asset.

56.    To the extent the OFS project moves forward without Key Ingredient's involvement, OFS would require Groupe SEB to develop and market a CMS that competes with Key Ingredient's CMS.  Thus controlling-stockholder Groupe SEB Alliance is exploiting its control over Key Ingredient to furnish Groupe SEB and its affiliates with access to Key Ingredient trade secrets to the detriment of Key Ingredient's sole minority stockholder.

57.    In addition, whereas Director Defendants, in their capacities as officers for SEB, had previously made representations that Groupe SEB would use Key Ingredient for production of recipe reader devices used in conjunction with the CMS, thereby ensuring a revenue stream for Key Ingredient, Crevoisier has more recently stated that he would be diverting the opportunity to manufacture recipe readers for the OFS project to a different Groupe SEB affiliate and away from Key Ingredient.

### H.    Key Ingredient's Arbitration Demand Against SAS SEB

58.    On November 9, 2012, Key Ingredient—through its counsel at Faegre Baker Daniels, LLP—filed a Request for Arbitration against SAS SEB seeking damages and an accounting based on SAS SEB's breaches of the non-competition provision in the CMS Agreement.

1810092v1 12/21/2012

### I.   Director Defendants Conspire with SEB to Terminate Goodman at the November 12, 2012 Board Meeting

59.     On November 12, 2012, Defendant Crevoisier and Defendant Camphuis met with Goodman in person in Austin, Texas for Key Ingredient's monthly board meeting.  Defendant Bouzigues joined the meeting telephonically.

60.     The first business considered by the Board was CEO Goodman's appointment of Steven Kennedy of Faegre, Baker & Daniels as Key Ingredient's corporate counsel.  Goodman hired Kennedy to replace Thomas Buchanan following Buchanan's resignation as corporate counsel for Key Ingredient because of the conflict of interest that had arisen as a result of his representation of Groupe SEB and the dispute between Key Ingredient and Groupe SEB.  Goodman made a motion that Kennedy serve as secretary and nominated him to take minutes for the board meeting.  The other three members of the Board objected to Kennedy's nomination and presence at the meeting, and the Board voted 3 to 1 to force him to leave the meeting.

61.     After further discussion, Director Defendants voted 3 to 1 to terminate Goodman as CEO and president of the Company.   Director Defendants then appointed Defendant Creviosier to serve as interim CEO.

62.     On information and belief, Director Defendants thereafter directed Faegre, Baker & Daniels to stop work on the arbitration that had been filed against SAS SEB.

63.     Director Defendants acted disloyally to Key Ingredient and its stockholders by taking steps to prevent the arbitration against SAS SEB from going forward and by allowing the breaches of contractual obligations and the misuse of Key Ingredient's confidential material to continue unabated.

1810092v1 12/21/2012

**J.      The December 10, 2012 Board Meeting**

64.      On December 10, 2012, the Board of Directors met telephonically.   At the meeting, Goodman inquired of the Board what person was responsible for making decisions concerning the dispute and arbitration with SAS SEB.   Director Defendants responded that Crevoisier had that responsibility.   Goodman pointed out that as President of SAS SEB, Crevoisier had a conflict of interest, and he asked that a disinterested person be appointed. Director Defendants refused  Goodman's request.

**CAUSES OF ACTION**
**Derivative Counts**

**COUNT ONE: Breach of Fiduciary Duty Against the Director Defendants**

65.      Plaintiff repeats and incorporates by reference each of the allegations contained in the foregoing paragraphs.

66.      Director Defendants are members of the Board and, as such, owe fiduciary duties of loyalty and care to Key Ingredient and its stockholders.   Directors Defendants' actions, as alleged herein, constitute a breach of their fiduciary duties.

67.      Upon information and belief, Director Defendants breached their fiduciary duties by taking actions and participating in conduct that was detrimental to Key Ingredient and not in the best interests of Key Ingredient and its stockholders.

(a)      Director Defendants acted wrongfully and disloyally by terminating management who was independent of Key Ingredient's contractual counterparty SAS SEB, in an effort to preserve the personal gain transferred to entities in which Director Defendants have an interest.

(b)      Director Defendants acted disloyally by funneling corporate opportunities to other entities to which they are interested and beholden, including Groupe SEB and its

17

subsidiaries and affiliates.

(c)     Director Defendants acted disloyally by failing to notify and advise their fellow board members of material events detrimental to the primary assets of Key Ingredient.

(d)     Director Defendants acted disloyally and without due care by wasting corporate assets and conspiring to disseminate, exploit, and misappropriate certain Key Ingredient trade secrets to entities not owned by Key Ingredient, to competitors of Key Ingredient, and to the French government.  The foregoing actions were committed for purposes of the personal gain of Groupe SEB and its affiliates.

(e)     Director Defendants acted disloyally by failing to take simple and reasonable steps to safeguard Key Ingredient's assets in the face of overwhelming evidence that such inaction would be significantly detrimental to Key Ingredient and its stockholders.

### COUNT TWO: Aiding and Abetting Breach of Fiduciary Duty
### Against Groupe SEB, SAS SEB and Groupe SEB Alliance

68.     Plaintiff repeats and incorporates by reference each of the allegations contained in the foregoing paragraphs.

69.     Upon information and belief, Groupe SEB, SAS SEB and Groupe SEB Alliance knowingly aided and abetted Director Defendants' breach of fiduciary duty by assisting and conspiring to harm Key Ingredient and its stockholders by wasting corporate assets, usurping corporate opportunities, and disseminating confidential trade secrets.

70.     Groupe SEB, SAS SEB and Groupe SEB Alliance are jointly and severally liable for their actions to join together with Director Defendants to knowingly assist in the breach of their duties to Key Ingredient.

1810092v1 12/21/2012

## COUNT THREE: Fraud Against All Defendants

71.     Plaintiff repeats and incorporates by reference each of the allegations contained in the foregoing paragraphs.

72.     Upon information and belief, Groupe SEB and SAS SEB, and the Director Defendants acting as agents for them, knew at the time the CMS Agreement was in negotiations and prior to the date of execution that SAS SEB and its affiliates would violate and take actions to circumvent the terms of the CMS Agreement, including taking steps to reverse-engineer the CMS source code and data structures through unauthorized access.

73.     As became evident to Key Ingredient just two months after executing the CMS Agreement, SAS SEB and its affiliates had begun violating the CMS Agreement terms while the CMS Agreement was being negotiated and soon after it had been executed.

74.     In July 2012, just two months after the execution of the CMS Agreement, Key Ingredient discovered that SAS SEB affiliates were violating the non-compete and non-disclosure terms of the CMS Agreement by developing and marketing a competing CMS to power certain competing projects and, upon information and belief, taking steps to reverse-engineer certain Key Ingredient trade secrets.

75.     In October 2012, Key Ingredient discovered that about the time the parties were negotiating the CMS Agreement, and soon after execution of the agreement, Director Defendants—acting on behalf of Groupe SEB—usurped corporate opportunities and took actions that blatantly breached the CMS Agreement by using Key Ingredient's proprietary CMS source code to support its Open Food System project and secure a €20 million in grant from the French government agency OSEO.

76.     The Company has been harmed by the foregoing fraudulent conduct.

### COUNT FOUR: Constructive Trust Against All Defendants

77.     Plaintiff repeats and incorporates by reference each of the allegations contained in the foregoing paragraphs.

78.     Director Defendants, Groupe SEB Alliance, and Groupe SEB along with its corporate parent Groupe SEB—have wrongfully profited from the breaches of duties, usurpation of corporate opportunity, and fraudulent actions described above.  Plaintiff seeks the imposition of a constructive trust upon all assets, websites, customers, software, and all revenues and profits that Defendants have received and continue to receive as a result of their illicit conduct and breaches of fiduciary duty.

### COUNT FIVE: Unjust Enrichment Against All Defendants

79.     Plaintiff repeats and incorporates by reference each of the allegations contained in the foregoing paragraphs.

80.     Director Defendants, Groupe SEB Alliance,  Groupe SEB, and SAS SEB have obtained benefits from Key Ingredient through a consistent pattern of unfair dealing and breach of fiduciary duties and acts of aiding and abetting in connection therewith.  They have usurped opportunities that rightfully belong to Key Ingredient and, by standing on both sides of various transactions, have unjustly enriched themselves to the direct financial detriment to Key Ingredient and its stockholders.

81.     As a result, Defendants have been unjustly enriched, and Plaintiff seeks recovery of all monies and assets supported by, and obtained by, Defendants through their illicit actions.

82.     Specifically, such unjust enrichment includes, but is not limited to, monies generated by Groupe SEB's affiliated internet websites that operate competing CMS programs

20

copied from Key Ingredient, monies awarded by the French government as a result of the OFS program that wrongfully relied on (and disclosed) Key Ingredient's proprietary trade secrets,  the profits Groupe SEB and its affiliates will earn in connection with the OFS project, and the value and benefit derived from any reverse engineering, copying, or re-creation of Key Ingredient's CMS source code and other proprietary information.

## Personal Capacity Count on Behalf of Goodman

### COUNT SIX: Fraudulent Inducement of the Stock Purchase Agreement

83.     Plaintiff repeats and incorporates by reference each of the allegations contained in the foregoing paragraphs.

84.     In negotiations for the SPA, Defendants Groupe SEB and Groupe SEB Alliance had a duty to refrain from disclosing Key Ingredient's proprietary information to third parties. Defendants violated that duty by disclosing Key Ingredient's materials in connection with the OFS project. Such disclosures include but are not necessarily limited to the submission of a to OSEO on or about April 29, 2011.  Defendants had a duty to disclose their misuse of Key Ingredient's information to Goodman with whom they were negotiating over the SPA.

85.     Defendants' failure to disclose was a material omission.

86.     Defendants knew Goodman was ignorant of the facts concerning the OFS grant and that he did not have an equal opportunity to discover the truth.  Defendants were deliberately silent concerning the OFS grant and purposefully concealed all facts pertaining to it.

87.     Defendants intended to induce Goodman to enter the SPA on economic terms that did not reflect the OFS project's existence and the fact of their breaches of confidentiality.

88.     Goodman suffered injury as a result of acting without knowledge of the undisclosed facts and is entitled to damages and rescission of the SPA as a result.

1810092v1 12/21/2012

## DISGORGEMENT AND DAMAGES FOR KEY INGREDIENT

89.     As redress for Defendants' acts of fraud and breaches of fiduciary duty, and aiding and abetting, Key Ingredient is entitled to an award of economic damages equal to the profits it has lost as a result of Defendants' misconduct, as well as punitive damages.

90.     In addition, Key Ingredient is entitled to disgorgement of the moneys that Defendants have wrongfully obtained or will obtain (including monies obtained by and through Groupe SEB affiliates) as a result of their misconduct.

## RESCISSION AND DAMAGES AS TO PLAINTIFF GOODMAN

91.     In addition, Plaintiff is entitled to rescission of the SPA as a result of Defendants' acts of fraudulent inducement.

92.     Plaintiff is also entitled to damages in his capacity as a shareholder.  Pursuant to § 21.563 of the Texas Business Organizations Code, amounts awarded for misconduct against Key Ingredient are payable directly to Goodman, as justice may require.  Plaintiff seeks recovery of the actual and punitive damages and restitution due to Key Ingredient, net of any offsetting amounts payable to SAS SEB in connection with the rescission of the SPA.

## REQUEST FOR PRELIMINARY INJUNCTION

93.     As set forth previously, upon information and belief, Director Defendants and Groupe SEB have misappropriated Key Ingredient's trade secrets and continue to work with competitors of the Company in disseminating, copying, and devaluing the most important assets of the Company.

22

94.     Furthermore, as a result of Director Defendants' failure to address the breaches of the CMS Agreement by SAS SEB and its affiliates, Defendants continue to engage in activity that violates the non-compete provisions of that agreement.

95.     Plaintiff requests that the Court enjoin the following activities (collectively, the "Enjoined Conduct") by Defendants and those acting in concert with them:

(a)     disseminating, copying, transferring, or reverse-engineering any of Key Ingredient's intellectual property, including but not limited to its CMS and its source code; and

(b)     developing, marketing, offering for sale, or selling any system, software or offering that is substantially similar to, or that would compete with, the CMS offered by Key Ingredient under the CMS Agreement.

96.     Absent issuance of an injunction, Key Ingredient will suffer irreparable harm. The disseminating, copying, transferring, or reverse engineering of the CMS and its source code threaten to destroy the value of Key Ingredient's greatest asset.   Similarly, money damages would be an inadequate remedy.

97.     There is a substantial likelihood Plaintiff will prevail on the merits.

98.     Furthermore, the balance of the equities favor Plaintiff.   To enjoin the Director Defendants from participating in the dissemination of Key Ingredient's trade secrets for the benefit of other entities such action will cause the Director Defendants no undue harm, as the Director Defendants are bound to abstain from such actions according to their fiduciary obligations to Key Ingredient.   Similarly, an injunction against SAS SEB and their affiliates would not be harmful because they are required by contract to abstain from engaging in the conduct to be enjoined.

23

## ATTORNEYS' FEES

99.     Plaintiff seeks an award of reasonable and necessary attorneys' fees and litigation expenses pursuant to § 21.561 of the Texas Business Organizations Code.

## JURY DEMAND

100.    Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays as follows:

a.      that Defendants be cited to appear and answer;

b.      that upon notice, the Court hear Plaintiff's application for preliminary injunction and, following an evidentiary hearing, enter a preliminary injunction, effective through trial and entry of final judgment, enjoining Defendant and those in active concert or participation with Defendant from engaging in the Enjoined Conduct described above, and to comply with the mandatory requirements of the injunction as specified above; and

c.      that upon final hearing the Court enter a judgment in favor of Plaintiff and against Defendants, and each of them, awarding the following relief:

i.      a permanent injunction permanently enjoining Defendants and those in active concert or participation with them from engaging in the Enjoined Conduct and further ordering that Defendants comply with the mandatory requirements of the injunction as specified above;

ii.     actual and punitive damages in such amount as may be shown by evidence;

      iii.     disgorgement of Defendants' profits earned as a result of Director Defendants' breaches of fiduciary duty and SAS SEB's opportunistic breach of the CMS Agreement, and the acts of aiding and abetting committed in connection therewith;

      iv.     rescission of the SPA;

      v.     Plaintiff's attorneys' fees;

      vi.     costs of Court;

      vii.     prejudgment and post-judgment interest as allowed by law; and

      viii.     such other and further relief, at law or in equity, to which Plaintiff may show itself to be justly entitled.

Respectfully submitted,

Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2200, Austin, TX  78701
P.O. Box 98, Austin, TX  78767
(512) 480-5616
(512) 480-5816 (facsimile)

By:    /s/ John J. McKetta, III
        John J. McKetta, III
        Texas State Bar No. 13711500
        mmcketta@gdhm.com
        Matthew C. Powers
        Texas State Bar No. 24046650
        mpowers@gdhm.com

ATTORNEYS FOR PLAINTIFF
DAVID H. GOODMAN